# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Remanded May 23, 2005

## STATE OF TENNESSEE v. CARLOS EDDINGS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-03777     W. Otis Higgs, Jr., Judge**

---

### No. W2005-01173-CCA-RM-CD  - Filed June 9, 2006

---

The Defendant, Carlos Eddings, was tried and convicted for aggravated robbery, and the trial court sentenced the Defendant to ten years in prison.  The Defendant appealed, and a majority of this Court concluded that his sentence must be modified to eight years pursuant to the United States Supreme Court case Blakely v. Washington, 542 U.S. 296 (2004).  State v. Carlos Eddings, No. W2003-02255-CCA-R3-CD, 2004 WL 2266794, at *1 (Tenn. Crim. App., at Jackson, Oct. 8, 2004).  The State filed an application for permission to appeal with the Tennessee Supreme Court pursuant to Rule 11(a) of the Tennessee Rules of Appellate Procedure.  On May 23, 2005, the Tennessee Supreme Court granted the State's application for the purpose of remanding the case to this Court for reconsideration in light of State v. Gomez, 163 S.W.3d 632 (Tenn. 2005).  On remand, we affirm the Defendant's ten-year sentence.

**On Remand from the Tennessee Supreme Court; Judgment of the
Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Garland Erguden, Memphis, Tennessee, for the Appellant, Carlos Eddings.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; David Zak, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

The facts at trial proved that while Celeste Williamson, the victim, was working at Direct Insurance on October 23, 2000, two black men, one tall with a mask on and an automatic weapon and the other the Defendant who held a roll of duct tape, came in the front door of the office.  The men came toward her and started yelling "b****, hurry up.  We're here to rob you and we've only

got two minutes so hurry up." The Defendant got behind the victim and was choking her as he wrapped her mouth, face, and nose with duct tape. The men dragged her to the safe and then ordered her to open the safe and were on either side of her while she was on her knees opening the safe. Williamson got the safe open and gave the men the two bags inside, which contained approximately $1700.00 in cash, money orders, and checks.

After the victim gave the men the money, the man with the mask told her to get down on the floor and then put the gun to her head and told her not to tell anyone or call the police. The Defendant then retrieved her billfold containing her credit cards, driver's license, and $295.00, and told her not to tell anyone because they had her personal information and would kill her if she did. Williamson was scared for her life and, as a result, she suffered a heart attack and was hospitalized for four days. Prior to going to the hospital, Williamson gave the police a description of the intruders, telling police that she noticed a scar that looked like a zipper on the Defendant's wrist.

The police learned later that day that the victim's credit card had been used at a gas station, and the gas station employees gave him a description and location of the car driven by the men using the victim's credit card. They discovered that the car was registered to Maurice Eddings, the Defendant's brother, and evidence used in this crime was located in the car.

The Defendant was arrested on November 2, 2000, and confessed to the crime. The Defendant told him that his brother-in-law planned the robbery and was armed with a semi-automatic handgun during the robbery and that his brother-in-law told him to duct tape the victim and to look for money inside the business. He told the officer how he and his brother-in-law split the money after the robbery. The officer read the Defendant's statement, stating:

> Question: Did you participate in the robbery of Direct Insurance Company located at 3388 North Watkins, which occurred on October 23, 2000, at approximately 9 a.m.? Answer: Yes, sir. Question: Who was with you during the robbery? Answer: . . . My brother-in-law. Question: Were you armed with a weapon? Answer: No, I was not. No, sir. Question: Was [your brother-in-law] armed with a weapon? Answer: Yes, sir. Question: Were you wearing a mask? Answer: No, sir. . . . Question: Was [your brother-in-law] wearing a mask? Answer: Yes, sir. Question: Who planned the robbery? Answer: It just happened, a really bad mistake of mine. Question: Why Direct Insurance company? Answer: It really was not just an exact reason why Direct Insurance. Question: Did you know that Direct Insurance kept a lot of money inside? Answer: Just I did not know that, no, sir. Question: Did you or [your brother-in-law] know any employees that worked inside? Answer: No, sir. Question: To your knowledge, does [your brother-in-law] or any of your family have insurance with Direct? Answer: No, sir, not to my knowledge.

The police investigation revealed that Maurice Eddings had a business relationship with Direct Insurance. The Defendant also told police the following:

Question: Explain to me in your own words the events leading up to the robbery and during the robbery. Answer: I spent the night over there that night with [my brother-in-law] . . . . We walked – parked the car, like, by the check cashing place basically on the corner. I walked in . . . first, and [my brother-in-law] came in behind me. I told the lady to be quiet and don't say anything and I attempted to put gray tape on her mouth. The tape didn't stick, and I attempted to wrap the tape around her and she . . . got the keys and opened the safe. [My brother-in-law] took the money out of the safe and we left. Question: Did you or [your brother-in-law] take the lady's pocketbook? Answer: [My brother-in-law] took it. Question: What kind of vehicle were you and [your brother-in-law] occupying? Answer: A gray Cavalier, his mother's car. Question: What was in the safe? Answer: [My brother-in-law] grabbed the little pouch thing and he got the lady's wallet. Question: How much money did you see after the robbery? Answer: It was like close to $2,000. Question: Did you see any checks in the pouch? Answer: Yes. I saw the checks and we threw them away. I think [my brother-in-law] threw them in the trash at home. Question: Did you see [your brother-in-law] with the lady's pocketbook? Answer: Yes, sir.

. . . Question: What happened to the contents of the pocketbook? Answer: We had that. I don't know exactly what he did with it – he had that . . . . Question: Where did you go after the robbery? Answer: To [my brother-in-law's] house . . . . Question: . . . What did you get as a result of this robbery? Answer: A little over $500. Question: Was there anyone else at the house when you and [your brother-in-law] split the money up? Answer: No, sir. Question: Did [your brother-in-law] give any of the contents to Maurice? Answer: Not to my knowledge. Answer: . . . Did you see Maurice the day of the robbery? Answer: No, sir. Question: What type of weapon did [your brother-in-law] have during the robbery? Answer: It was a handgun. I don't know for sure what kind but you rack it back. It's black. Question: Have you ever seen [your brother-in-law] with a gun before? Answer: No, sir. Question: Have you and [your brother-in-law] ever committed any other robberies? Answer: No, sir. . . . Question: Do you have any of the money left? Answer: No, sir. I spent it all. I can't recall where. Question: Is there anything else you would like to add to this statement? Answer: Yes, sir. I really wasn't trying to hurt anybody. I know that was a big mistake and I am very sorry. If it's possible, I'll get a job and do whatever they say and replace what they say is missing. Honestly, I'm not just a bad person. Never been involved in anything.

The officer then testified that he took a photograph of the Defendant's right arm that showed his scar and another of the Defendant's left arm that showed a tattoo of his name.

The Defendant testified on his own behalf that he was arrested while at his brother-in-law's house and taken to a gas station and then to the police station. The Defendant admitted that he has previously been arrested for theft of property. He said that his confession to the police was not truthful and denied involvement in the robbery.

Based upon this evidence a jury convicted the Defendant of one count of aggravated robbery.

## A. Sentencing Hearing

At the Defendant's sentencing hearing, the State told the trial court that the Defendant was a Range I, Standard Offender, and then recommended a sentence of ten years due to the serious nature of the crime. Williamson testified that she was still on leave from work at Direct Insurance. Williamson said that she recommended that the Defendant get a sentence longer than ten years because of the "severity of what he did to me, how long I'm going to be under doctor's care for the rest of my life, and on medication because of this. And the fact that while he was on -- out on bond for what he did to me [when] he committed other offenses." Williamson said that she is on two medications for her heart attack, has to go to physical therapy, and is under a psychiatrist's care and on medication for panic attacks. She has not been able to work since this crime.

The Defendant's pre-sentence report showed that he had two misdemeanor matters that were expunged from his record after he completed diversion and he had been, at the time of the hearing, indicted for aggravated burglary.

The Defendant testified and denied any involvement in this crime. He said that he has no prior convictions, but did have one charge pending against him. On cross-examination, the Defendant admitted that he had one prior conviction for theft of property under $500.

The State argued that the trial court should sentence the Defendant to ten years, two years above the presumptive minimum sentence of eight years, due to the severity of the crime. The trial court held:

[T]he Defendant in this case is charged with aggravated robbery, an aggravated robbery in which the victim testified that she has been severely physically and mentally injured as a result of the robbery.

I heard testimony at great length from the victim who testified at the trial that she continues to suffer from this incident, psychological problems, under the care of a psychiatrist, all of that. And it's a very serious matter. . . . [I]t was a very serious and a very aggravated robbery.

The interesting thing about this case is that the defendant maintains that he didn't do it. But I remember during the trial the defendant gave a written confession to this trial, to this case. During the trial he says he was coerced, that he was forced to give that statement because they told him that if you want to go home he would have to give a statement.

That he gave a statement under the mistaken thought that he would go home once he confessed. It's an inherent inconsistency quite frankly that a man says "they

said I could go home, but in order to go home I'd have to admit that I committed an aggravated robbery." But that's what he says.

. . . .

All those matters will have to be passed on by the Court. Based upon the severity of this case, however, and looking at what the State has presented I believe the State's recommendation of 10 years, as a Range I Standard Offender is a reasonable offer for this kind of case. . . . I'm going to sentence the Defendant to the 10 years as a Range I Standard Offender . . . .

## II. Analysis

On remand, we must determine whether the trial court erred when it sentenced the Defendant. The trial court applied five enhancement factors when it sentenced the Defendant to ten years in prison. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401 Sentencing Comm'n Cmts.

Our review requires an analysis of: (1) the evidence, if any, received at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class B felony conviction, the presumptive sentence is the statutory minimum of eight years for a Range I offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c) (2003).[1] If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence.

---

[1]Effective July 7, 2005, this code section no longer provides for a presumptive minimum. Because, however, the Defendant in this case was sentenced under the previous statute, we will consider that statute in our analysis.

Tenn. Code Ann. § 40-35-210(e).  The sentence must then be reduced within the range by any weight assigned to the mitigating factors present.  Tenn. Code Ann. § 40-35-210(e).

In the case under submission, in arriving at a mid-range sentence of ten years the trial court applied the following five enhancement factors and no mitigating factors:

> (6) the Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
> (9) the Defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community;
> (10) the Defendant possessed or employed a firearm during the commission of the offense;
> (11) the Defendant had no hesitation about committing a crime when the risk to human life was high; and
> (17) the crime was committed under circumstances under which the potential for bodily injury to a victim was great.

See Tenn. Code Ann. § 40-35-114 (2003).  The trial court did not provide any findings of fact; rather it simply checked these factors as applicable on a pre-written form.  As our Supreme Court has explained, "To facilitate appellate review, the trial court 'must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.'"  State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)); see also State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).  We conclude that we must review the Defendant's sentence de novo because there is no affirmative showing in the record that the trial court conducted such an analysis and because we have concluded that the trial court erroneously applied the five enhancement factors it found applicable and failed to apply two factors that are applicable.

On appeal, the Defendant contended that the trial court erroneously applied each of these five enhancement factors.  When we first reviewed this case, we applied the United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. 296 (2004), which called into question the continuing validity of our current sentencing scheme.  In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors.  Blakely, 542 U.S. at 304.  The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"  Id. at 303.  Finally, the Court concluded that "every defendant has a *right* to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment."  Id. at 313.

When this case was remanded, the Tennessee Supreme Court directed us to reconsider our previous decision in light of the Court's recent decision in State v. Gomez, 163 S.W.3d 632 (Tenn. 2005). In that case, the Tennessee Supreme Court concluded that Blakely does not apply to Tennessee's sentencing scheme because "the Tennessee Criminal Sentencing Reform Act does not authorize a sentencing procedure which violated the Sixth Amendment right to jury trial." State v. Gomez, 163 S.W.3d 632, 651 n.16 (Tenn. 2005). Accordingly, pursuant to this recent decision, we turn to decide whether the Defendant's ten-year sentence may stand.

The State concedes, and we agree, that four of the five enhancement factors used by the trial court to enhance the Defendant's sentences are not applicable. The State contends, however, that the fifth enhancement factor applied by the trial court, enhancement factor (6), was properly applied because the Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. This factor is generally applied to cases involving abuse or torture. State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995). Before a trial court may apply enhancement factor (6) to increase a sentence, the facts of the case must support a "finding of cruelty under the statute 'over and above' what is required to sustain a conviction for [the] offense." State v. Arnett, 49 S.W.3d 250, 258-59 (Tenn. 2001). Although we believe that the victim in this case was treated with cruelty, we do not believe the facts of this case support the trial court's finding of exceptional cruelty as required by enhancement factor (6). Nevertheless, we find in our de novo review that two enhancement factors do apply.

The record evinces that the Defendant has one prior conviction for misdemeanor theft. Therefore, enhancement factor (2), that the Defendant has a history of criminal convictions in addition to those necessary to establish the range, does apply. We, however, give that enhancement factor little weight. Additionally, we conclude that enhancement factor (13) is applicable. That enhancement factor provides that, "During the commission of a felony . . . the actions of the defendant resulted in the . . . serious bodily injury to a victim . . . ." Tenn. Code Ann. § 40-35-114(13). "Serious bodily injury" includes the protracted loss or substantial impairment of a function of a bodily organ. Tenn. Code Ann. § 39-11-106(34) (2003). In the case under submission, the victim suffered a heart attack as the result of this incident, and she had to spend four days in the hospital. The victim must be on medication and under a doctor's care for the rest of her life. This constitutes seriously bodily injury so as to make applicable enhancement factor (13). Further, there are no applicable mitigating factors. The applicable range is eight to twelve years, and we conclude from our de novo review that the trial court's imposition of a ten-year incarcerative sentence is proper in this case.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE